Marguerite A. NICHOLS, as Executrix of the Estate of August Nimphius, Jr.,

v.

VILLAGE OF PELHAM MANOR, et al., Defendants.

No. 95 CIV. 8438 (LAK).

United States District Court, S.D. New York.

July 31, 1997.

Terrence J. Dwyer, Bronxville, NY, for plaintiff.

Thomas M. Bona, James C. Miller, New York City, for defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

On July 9, 1994, the late August C. Nimphius, Jr., then the Town Leader of the Conservative Party in the Village of Pelham Manor, New York (the "Village"), was arrested while circulating political nominating petitions and charged with violating the Village's solicitation ordinance and with disorderly conduct. The charges ultimately were dropped, and Mr. Nimphius brought this action against the Village and a number of its police officers. He claims that the statutes under which he was arrested are unconstitu-

tional and that he otherwise was deprived of his constitutional rights.[1]

*Facts*

On the date in question, Mr. Nimphius went door-to-door through the Village seeking signatures for political nominating petitions.[2] No one answered his ring at the Perillo residence when Mr. Nimphius visited early in the day, so he returned at around 8 p.m. and rang the bell several times.

Jennifer Perillo, the fourteen year-old daughter of the owners, was home on both occasions, but she did not answer the door. At the time of the evening visit, she called the Village police and reported that a man who had been at her house earlier that day again was at her door and that she "was nervous about his activities." (Perillo Dep. Ex. K) Ms. Perillo related further that the visitor had parked a blue car in front of her house and opened its hood.

Village Police Officers Panaro, Gaul, Orifici, and Carpenter, all of whom are named as defendants in this suit, responded to Ms. Perillo's call. Mr. Nimphius, oblivious to the impending arrival of the police, drove away from the Perillo home and stopped on another street, again opening the hood of his car. When the police arrived at the Perillo residence, they found that the unidentified caller had departed, so Officer Gaul left to look for him on other streets. When he happened upon a blue car with its hood open, he correctly surmised that it belonged to the individual who had been the subject of Ms. Perillo's call. Officer Gaul claims that as he came upon the scene, Mr. Nimphius was walking away from the front door of a house on the street on which he was then parked. (Gaul Dep.Ex. H 10; Ex. 22)

Although there is no meaningful dispute over the facts up to this point, the parties' versions of events diverge markedly beginning with the first interaction between Mr.

Nimphius and the Village police. Defendants claim that "plaintiff vehemently refused to respond, began shouting and caused a disturbance" in response to Officer Gaul's attempted questioning. (Def.Mem. 3: Panaro Dep.Ex. G 11-12; Gaul Dep.Ex. H 18; Carpenter Dep.Ex. I 12)[3] Plaintiff claims that "although [he] berated the defendant police officers as uneducated ignoramuses, he did [*sic*] neither shouted nor caused a disturbance." (Pl.Mem. 4-5) In his deposition, he stated "there were no loud voices and . . . there was no collection of people in the neighborhood" as a result of his interaction with the police. (Ex. 5, 32-33) He claims also that he informed the officers that they had no right to interfere with his political activities.

Whatever transpired between Mr. Nimphius and the police, it is undisputed that at some point the officers informed Mr. Nimphius that he was violating the Village's prohibitions on disorderly conduct and soliciting without a permit. (Panaro Dep.Ex. G 21) Mr. Nimphius eventually was placed under arrest and brought to Village police headquarters, where he was detained for approximately one hour while he was issued appearance tickets for disorderly conduct and soliciting without a permit. Plaintiff never was searched, placed into a cell, handcuffed, photographed, or fingerprinted. Plaintiff alleges that his briefcase and car were searched by the police during his detention, and defendants have not denied that such a search might have occurred.

On October 2, 1995, plaintiff brought this suit alleging that his civil rights were violated under color of state law in contravention of 42 U.S.C. § 1983. In addition to the Village, the complaint names Officers Orifici, Gaul, Panaro, and Carpenter as defendants in their official and personal capacities. The Court later granted leave to amend the complaint to add Officer Lenci as a defendant.

---

1. Mr. Nimphius died during the pendency of this action, and his executrix has been substituted as plaintiff. For ease of expression, the Court nevertheless refers to the late Mr. Nimphius as if he remained a party.

2. Mr. Nimphius conceded that he did not possess, or apply for, a permit to solicit in the Village.

3. At some point, all of the individual defendants save Officer Lenci arrived at the scene. Neither party's papers make clear when this occurred.

The complaint alleges a panoply of constitutional violations in extraordinarily vague and confusing terms. The clearest statement of plaintiff's claim is the allegation that:

"plaintiff was deprived of his Civil Rights not to be subjected to harm and to be free of cruel and unusual punishment without due process and to be peacefully secure in his person and to be afforded equal protection of the law in furtherance of his speech at the hands of persons acting under the color of Village law, all in violation of his Civil Rights under the Constitution of the United States and particularly the First, Fourth, Eighth and Fourteenth Amendments thereof." (Cpt ¶ 14)

Despite the inartful pleading, it is possible to discern the claims made by Mr. Nimphius. He alleges that (1) his arrest violated his rights under the First and Fourteenth Amendments; (2) his arrest for activities which others undertook with no response from the police denied him the equal protection of the law; and (3) he was arrested without probable cause in violation of the Fourth and Fourteenth Amendments.[4] Defendants seek summary judgment dismissing all of plaintiff's claims on the ground that there was no violation of his rights. Defendants argue also that plaintiff has not made allegations sufficient to subject the Village to liability and that the individual defendants are entitled to qualified immunity from all of plaintiff's claims.

*Discussion*

*I. First Amendment Claim*

Plaintiff claims that the Village's solicitation and disorderly conduct ordinances are unconstitutional and that his arrest under these ordinances therefore violated his civil rights under color of state law.[5] Defendants

---

4. Plaintiff asserts a cruel and unusual punishment claim as well. However, the Eighth Amendment's prohibition on cruel and unusual punishment applies only after a person has been adjudicated guilty of a crime and is thus subject to punishment. It thus has no relevance in this case. *City of Revere v. Massachusetts General Hosp.*, 463 U.S. 239, 243–44, 103 S.Ct. 2979, 2982–83, 77 L.Ed.2d 605 (1983); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir.1996).

5. Section 25, the solicitation ordinance, provides that:

"Maintenance of the good order, of the health and comfort of the community and the protection of the property of the residents being impossible without adequate regulation of the time, place, and manner of solicitation and of the distribution of literature, to the end that such residents may be protected from annoyance, including, among other things, unwelcome interference with their privacy with the rest and enjoyment of their homes;

"In order to facilitate the investigation of such solicitors and distributors, coming into the community, and the regulation of the conditions under which they shall operate within the Village and by such regulation to protect the health, comfort and convenience of the residents and prevent breaches of the peace, on the streets and at the residences, and to make possible and, in part at least, to defray the cost of such investigation and regulation;

"It shall be unlawful for any person to solicit alms, or make any other solicitation or distribute handbills, tracts, literature or similar articles within the village, without complying with the following requirements:

"1. He shall file with the Chief of Police of the Village a statement showing, over the signature of such applicant:

(a) His full name and permanent address.

(b) The name and address of the person for whom or of the organization for which he desires to act.

(c) Whether such applicant then has or within six months previous has had any contagious or communicable disease.

(d) Whether such applicant has been convicted of any crime or misdemeanor or breach of the peace, and, if so, the facts and circumstances thereof, including the present status of such proceeding.

"2. He shall obtain a license approved by said Chief of Police upon an application predicated (by reference or by repetition) upon the facts referred to in Paragraph 1 hereof and such other facts as the Chief may deem necessary after investigation and also upon payment of a fee therefor. Such license shall be granted, unless the Chief shall then deem it necessary for the carrying out of the expressed purposes of this ordinance to refuse it.

"(The sole purpose of the registration and licence provided for in paragraphs "1" and "2" above, being to facilitate reasonable investigation and regulation, such registration and license may be waived by said Chief of Police, as to any person known to him or vouched for by the head of any local church or organizations or other person known to said Chief.)

"3. He shall not so distribute any such article or solicit at any point within the Village after 5 P.M. or before 9 A.M.

"4. He shall not distribute any such article or solicit at the residence of any inhabitant or at any church or public place, where such solici-

claim that the solicitation statute is valid and seek summary judgment dismissing this claim. They present no argument with regard to the disorderly conduct statute.

### 1. The Solicitation Ordinance

Four aspects of the Village solicitation ordinance are significant for First Amendment purposes. The first is the vast authority given to the Chief of Police in the permit-granting process. (Subsection 2) The second is its failure to specify a time period within which an application must be approved or denied. (*Id.*) The third is the absolute ban on solicitation on the streets of the Village. (Subsection 5) The fourth is the vagueness of key terms in the ordinance. (Subsection 3)

### A. Permit Granting Procedure

The broad discretion afforded the Chief of Police in the permit-granting process calls into question the validity of the solicitation ordinance. However, Mr. Nimphius' standing to challenge this procedure is not self-evident.

As a general rule, federal courts will entertain constitutional challenges to statutes only as they are applied. Because Mr. Nimphius failed to apply for a permit under the ordinance, he would be precluded from challenging the permit-granting procedure on an as-applied basis. *See Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 166–67, 92 S.Ct. 1965, 1968–69, 32 L.Ed.2d 627 (1972) (no standing to challenge racially exclusive membership policy unless plaintiff applied for membership); *see also Law Students Civil Rights Research Council v. Wadmond*, 401 U.S. 154, 165, 91 S.Ct. 720, 727–28, 27 L.Ed.2d 749 (1971). There are, however, several exceptions to the general rule of as-applied review. One applies to statutes, like this one, that give broad discretion to a permit-granting authority.

"In the area of freedom of expression it is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be prescribed by a properly drawn statute, and whether or not he applied for a license." *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965).[6]

There can be no serious dispute that solicitation is a form of speech protected by the First Amendment.[7] As the ordinance gives the Chief of Police discretion to deny an applicant the right to solicit in the Village, Mr. Nimphius has standing to bring a facial challenge to the constitutionality of the ordinance.

The issue presented by the permit-granting authority conferred by the Village on its Chief of Police is not novel:

"[M]any decisions of [the Supreme] Court over the last [50] years [have held] that a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." *Shuttlesworth v. Birmingham*, 394 U.S. 147, 150–51, 89 S.Ct. 935, 938, 22 L.Ed.2d

---

tation or distribution is objected to, and upon being told of or otherwise ascertaining such objection, shall immediately depart, peaceably, without violence or abuse.
"5. He shall not solicit pedestrians passing along the streets of the Village." PELHAM MANOR, N.Y., VILLAGE CODE § 25.
Section 5, the disorderly conduct ordinance, provides that:
"It shall be unlawful for any person to engage in noisy, riotous or tumultuous conduct or language, disturbing or tending to disturb the peace and quiet of the Village or any meeting or assembly therein, or to incite, or aid in any riotous, tumultuous assemblage, in or on any private property or streets or the doorways or stairways adjacent thereto." *Id.* § 5.

6. *Accord, City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 756–57, 108 S.Ct. 2138, 2143–44, 100 L.Ed.2d 771 (1988); *Lovell v. Griffin*, 303 U.S. 444, 452–53, 58 S.Ct. 666, 669, 82 L.Ed. 949 (1938).

7. *International Society for Krishna Consciousness v. Lee*, 505 U.S. 672, 677, 112 S.Ct. 2701, 2704–05, 120 L.Ed.2d 541 (1992); *Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620, 629, 100 S.Ct. 826, 832, 63 L.Ed.2d 73 (1980); *Hynes v. Mayor and Council of the Borough of Oradell*, 425 U.S. 610, 616–20, 96 S.Ct. 1755, 1758–60, 48 L.Ed.2d 243 (1976); *Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939).

162 (1969).[8]

■ The Village ordinance grants discretion to the Chief of Police, both in investigating applications and in approving the issuance of permits. It lacks, however, any "narrow, objective and definite standards" to guide the discretion of the licensing authority. Under the Village ordinance, the Chief may not refuse a permit unless he determines that a denial is necessary to carry out one of the express purposes of the statute.[9] However, it is the Chief's subjective determination of what is necessary that serves as the only limit on his power. As the statute is written, the Chief can prevent expression based solely on what he thinks will be the effect of the proposed expression. His discretion is not restrained by meaningful, objective standards.

In *Shuttlesworth*, the Court held such limitations on discretion insufficient. There the statute required the issuance of a permit unless in the judgment of the issuing body "the public welfare, peace, safety, health, decency, good order, morals or convenience require that it be refused." *Shuttlesworth*, 394 U.S. at 149–50, 89 S.Ct. at 938. The Court held that these standards did not sufficiently limit the discretion of the permit granting body. "For in deciding whether or not to withhold a permit, the members of the Commission were to be guided only by their own ideas of 'public welfare, peace, safety, health, decency, good order, morals or convenience.'" *Id.* at 150, 89 S.Ct. at 938.

*Hague v. C.I.O.*, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), is to similar effect.

The Court there found the challenged statute unconstitutional because:

"[i]t enables the Director of Safety to refuse a permit on his mere opinion that such refusal will prevent 'riots, disturbances or disorderly assemblage.' It can thus, as the record discloses, be made the instrument of arbitrary suppression of free expression of views on national affairs for the prohibition of all speaking will undoubtedly 'prevent' such eventualities. But uncontrolled official suppression of the privilege can not be made a substitute for the duty to maintain order in connection with the exercise of the right." *Id.* at 516 [59 S.Ct. at 964] (opinion of Roberts, J.) (plurality); *see also Schneider*, 308 U.S. at 163–64 [60 S.Ct. at 151–52] (power to refuse permits only if applicant "is not of good character or is canvassing for a project not free from fraud" not a valid limit on officer's discretion).

The purposes stated in the Village ordinance all are so broad that they provide no meaningful standards to reign in the Chief's discretion. The ordinance allows the Chief to inquire into any issue he thinks is relevant, and to determine what he thinks is necessary to preserve the "good order" of the community or to protect the residents from "annoyance." Because any solicitation might cause annoyance, the Chief could suppress any proposed solicitation on that basis, even if actually motivated by a desire to censor content. The standards limiting official discretion in *Hague* and *Shuttlesworth* were more definite, objectively determinable and significant than those in the Village ordi-

---

8. *Accord, Lakewood*, 486 U.S. at 769–70, 108 S.Ct. at 2150–51; *Staub v. Baxley*, 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958); *Kunz v. New York*, 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951); *Thomas v. Collins*, 323 U.S. 516, 526, 65 S.Ct. 315, 320–21, 89 L.Ed. 430 (1945); *Schneider v. State of New Jersey*, 308 U.S. 147, 164, 60 S.Ct. 146, 152, 84 L.Ed. 155 (1939); *Lovell v. City of Griffin*, 303 U.S. 444, 450–51, 58 S.Ct. 666, 668–69, 82 L.Ed. 949 (1938).

9. In determining whether to deny an application, the Chief must decide what he feels is "necessary for the carrying out of the express purposes of the ordinance." There are a number of purposes expressed in the ordinance which the Chief

might decide to carry out. In its first two paragraphs, the ordinance adverts to the "[m]aintenance of the good order, of the health and comfort of the community and the protection of the property of the residents," as reasons why the regulation of solicitation is necessary. The ordinance notes also that the regulation is created "to the end that such residents may be free from annoyance, including, among other things, unwelcome interference with their privacy, with their rest and with the enjoyment of their homes." Finally it recites that the regulation seeks to "protect the health, comfort, and convenience of the residents and prevent breaches of the peace, on the streets and at the residences" of the Village.

nance, yet they were held to be constitutionally insufficient.

■ "[A]n ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or licence which may be granted or withheld in the discretion of such an official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub*, 355 U.S. at 322, 78 S.Ct. at 282. Defendants motion for summary judgment on this claim is denied.

### B. Absence of a Time Limit for Action on Applications

■ Even if the ordinance did not grant unfettered discretion to the Chief of Police, its lack of any time limit for the consideration of applications independently would require its invalidation.

In ruling on a facial challenge to a solicitation licensing statute, the Supreme Court explained that:

> "such a regulation must provide that the licensor 'will within a specified brief period, either issue a license or go to court.' *Freedman v. Maryland*, 380 U.S. 51, 59 [85 S.Ct. 734, 739, 13 L.Ed.2d 649] (1965). That requirement is not met here, for the [statute in question] permits delay without limit. The statute on its face does not purport to require when a determination must be made, nor is there an administrative regulation or interpretation doing so.... [D]elay compels the speaker's silence. Under these circumstances, the licensing provision cannot stand." *Riley v. National Federation of the Blind of North Carolina*, 487 U.S. 781, 802, 108 S.Ct. 2667, 2680, 101 L.Ed.2d 669 (1988).

Like the regulation invalidated in *Riley*, the Village ordinance at issue here prescribes no time limit for the consideration of an application. Nor is there a provision allowing solicitation while the application is pending. Consistent with the ordinance, the Chief simply could neglect to act on an application for an indefinite period. Such a delay effectively could silence a solicitor like Mr. Nimphius, whose effort to qualify candidates for an election was time-sensitive. Thus, the absence of any time limit for a decision on applications further demonstrates the unconstitutionality of the Village solicitation ordinance.

### C. Prohibition on All Solicitation in the Village Streets

Subsection 5 of the solicitation ordinance makes it unlawful to "solicit pedestrians passing along the streets of the Village." It is a clear, outright ban on any solicitation in the Village streets.

■ Although the plaintiff was not arrested for soliciting in the streets of the Village, and so this aspect of the ordinance was not applied to him, another exception to the rule of as-applied review exists where a plaintiff alleges that a statute is overbroad. *Secretary of State of Maryland v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958, 104 S.Ct. 2839, 2847–48, 81 L.Ed.2d 786 (1984). Plaintiff thus has standing to challenge the ordinance on its face on the ground of overbreadth even though he did not engage in the prohibited conduct.

■ In the context of an overbreadth challenge, a law is facially invalid if it "does not aim specifically at evils within the allowable area of control ... but sweeps within its ambit other activities" which are protected by the First Amendment. *Thornhill*, 310 U.S. at 97, 60 S.Ct. at 742. Such overbreadth "must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. at 615, 93 S.Ct. at 2918. The legitimate sweep of a statute depends upon: (1) the restrictions that the statute places on the content of expression, and (2) the expressive fora that it regulates. Restrictions that target categories of speech on the basis of their content cause a statute to be subjected to an especially demanding standard of review, while those that regulate the time, place and manner of speech without regard to its content are far more likely to be upheld.

■ This Court is satisfied that Subsection 5 of the solicitation ordinance is a content neutral restriction on the time, place, or

manner of expression. The ordinance makes every sort of solicitor liable to its restrictions. It makes no distinction between solicitations for money, political support, religious causes, or any other aim. As written, it exempts no purpose or subject matter from its scope. Statutes which place restrictions on all forms of solicitation, no matter what their content or purpose, generally have been held to be content neutral in the past, and this statute fits into that category.[10]

■ The Supreme Court's "cases have recognized that the standards by which limitations on speech must be evaluated 'differ depending on the character of the property at issue.'" *Frisby v. Schultz*, 487 U.S. 474, 479, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (quoting *Perry Education Assoc. v. Perry Local Educators' Assoc.*, 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). Three types of fora have been identified: the traditional public forum, the public forum created by government designation, and the nonpublic forum. Subsection 5 of the solicitation ordinance is an outright ban on the solicitation of pedestrians on the Village's streets. The Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum." *Frisby*, 487 U.S. at 480, 108 S.Ct. at 2500; *see Perry*, 460 U.S. at 45, 103 S.Ct. at 954–55; *Hague*, 307 U.S. at 515, 59 S.Ct. at 963–64 (opinion of Roberts, J.) (plurality).

■ As a law which restricts speech in a public forum, the Village ordinance must be tested under a heightened level of judicial scrutiny.[11] The Court has stated that:

"[i]n these quintessential public for[a], the government may not prohibit all communicative activity. For the State to enforce a content-based exclusion it must show that its regulation is necessary to serve a com-

pelling state interest and that it is narrowly drawn to achieve that end ... The State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955. (citations omitted).

The interest that the Village ordinance is said to serve—that the "residents may be protected from annoyance, including, among other things, unwelcome interference with their privacy, with their rest, and with the enjoyment of their homes"—in various formulations has been recognized as a legitimate government interest. *Frisby*, 487 U.S. at 484, 108 S.Ct. at 2502 (" 'The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.' ") (quoting *Carey v. Brown*, 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263 (1980)); *Schaumburg*, 444 U.S. at 636, 100 S.Ct. at 835–36; *Hynes*, 425 U.S. at 616–20, 96 S.Ct. at 1758–59. However, "[t]he Village's legitimate interest[s] can be better served by measures less intrusive than a direct prohibition on solicitation." *Schaumburg*, 444 U.S. at 637, 100 S.Ct. at 836. Banning solicitation on the streets probably helps maintain the good order of the Village and keep the residents free from annoyance, but it also dramatically curtails outdoor public expression on any topic. As an alternative, the Village could ban solicitation after certain hours or require that solicitors not harass passers-by in order to preserve privacy and prevent annoyance. The outright ban on all solicitation in the Village streets is manifestly not a narrowly tailored attempt to

---

10. *See, e.g., Frisby v. Schultz*, 487 U.S. 474, 483–87, 108 S.Ct. 2495, 2501–04, 101 L.Ed.2d 420 (1988). The Court notes that plaintiff does not attempt to argue that the ordinance is not content-neutral as written.

11. Indeed, even if this ordinance did not regulate public fora, it might be subject to enhanced scrutiny because of the manner of speech which it regulates. "Activities such as leafleting and solicitation are by tradition and function so closely linked with free expression that the [Supreme]

Court has properly scrutinized restrictions upon those activities with special care, without pausing to establish at the outset that the restrictions operate in a public forum. Instead, the approach has been to presume a need for strict scrutiny unless a particularly *non*-public forum is involved. Laurence H. Tribe, AMERICAN CONSTITUTIONAL LAW 988 (2d Ed.1988) (footnotes omitted). Because the Village ordinance so clearly regulates a quintessentially public forum, this principle need not come into play here.

achieve a legitimate government interest. Indeed, a number of cases have found far narrower restrictions on expression based on similar governmental purposes to be substantially overbroad. *See, e.g. Riley,* 487 U.S. at 800–01, 108 S.Ct. at 2679–80; *Schaumburg,* 444 U.S. at 637, 100 S.Ct. at 836; *Thomas v. Collins,* 323 U.S. 516, 538, 65 S.Ct. 315, 326, 89 L.Ed. 430 (1945); *Jamison v. Texas,* 318 U.S. 413, 417, 63 S.Ct. 669, 672, 87 L.Ed. 869 (1943); *Lovell,* 303 U.S. at 451, 58 S.Ct. at 668–69. This Court holds the solicitation ordinance unconstitutional for substantial overbreadth.

### D. Vagueness

■ Subsection 3 of the ordinance makes it unlawful to continue to solicit at a public place, church or residence "where such solicitation is objected to, and upon being told of or otherwise ascertaining such objection." The ordinance provides no further insight into what qualifies as an objection under Subsection 3. The Court finds this section of the ordinance unconstitutionally vague.

Mr. Nimphius has standing to challenge this provision of the soliciting ordinance because he specifically was charged with soliciting "where said solicitation is objected to, and did also refuse to peaceably depart after such objection was made" in violation of the statute. (Ex. 1)

■ A statute is unconstitutionally vague when persons "of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. General Construction Co.,* 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926); *see Hynes v. Mayor and Council of Borough of Oradell,* 425 U.S. 610, 620–23, 96 S.Ct. 1755, 1760–62, 48 L.Ed.2d 243 (1976) (ordinance banning neighborhood solicitation void for vagueness). The Village ordinance is such a statute.

This vagueness becomes clear when one considers how this provision of the ordinance might be enforced. An "objection" under the ordinance might take a number of forms which could be used to limit protected speech. For example, in response to a speech on the steps of Village Hall criticizing the management of the Village, the Mayor

might note that he "objected" to his characterization by the speaker. If the speaker pressed his point even after this "objection," he could be in violation of the terms of the statute. Moreover, a passer-by could "object" to the content, but not the manner, of a solicitation on a city street and, if the solicitor continued espousing his or her message, he or she could be found in violation of the ordinance.

By employing, without defining, a term like "objection," the Village ordinance forces people to guess, at their peril, whether certain public reactions to their expression would be regarded as "objections" in the meaning of the statute. A statute which made illegal "any public discourse with which another person verbally disagrees" would undoubtedly be overbroad. Yet nothing in the ordinance precludes its being enforced in this manner. Because the phrase in question is of indeterminate meaning, and that indeterminacy might cause the suppression of protected speech, the ordinance is void for vagueness.

In consequence, defendants' motion for summary judgment on plaintiff's claim that his First Amendment rights were violated under color of state law is denied on each of the independent grounds discussed above.

### 2. Disorderly Conduct Ordinance

■ Plaintiff claims in his memorandum that "the ordinances under the color of which the foregoing events took place are unconstitutional." (Pl.Mem. 7) He thus appears to claim that both the soliciting and the disorderly conduct ordinances are unconstitutional. The complaint, however, alleges only that "that the Village ordinance Sect. 25 [the solicitation ordinance] were [*sic*] written and intended to harass citizens with legitimate purposes." (Cpt. ¶ 13) It is devoid of any claim that the disorderly conduct ordinance is unconstitutional. Nor has plaintiff sought to amend the complaint to add this claim. Defendants, quite justifiably, have not presented any argument regarding the constitutionality of the disorderly conduct statute. More remarkably, neither has the plaintiff, outside of the conclusory assertion in his memorandum that the statute is unconstitu-

tional. To the extent that plaintiff actually is alleging such unconstitutionality, it is thus not properly before the Court.

## II. Equal Protection Claim

Plaintiff makes two related equal protection claims. The first is that plaintiff "as a member of the New York State Conservative Party, was treated differently than ... those members of the Democratic and Republican political parties who went through the streets of Pelham Manor during the June 14, 1994 to July 9, 1994 period obtaining signatures" without a permit. (Pl. 3(g) ¶ 3) The second alleges that "[t]he detention and arrest of [plaintiff], as well as the seizure and search of his vehicle, and search of his briefcase, were unnecessary for the offenses charged where the Pelham Manor Police Department's practice is to issue a summons which requires payment of a fine" and that "[t]here was disparate treatment of [plaintiff] because of his political activities." (Id. ¶ 4)

■ Plaintiff appears to claim that the Village laws were applied selectively and more intrusively to him because of his party affiliation. A claim that a person has been denied equal protection through selective enforcement of the law requires proof that:

"(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders,* 627 F.2d 606, 609–10 (2d Cir.1980).[12]

Defendants move for summary judgment on these claims. The Court may grant a motion for summary judgment only if no material issue of fact exists after "view[ing] the evidence in the light most favorable to the party opposing the motion, drawing all permissible inferences from the submitted affidavits, exhibits, interrogatory answers, and depositions in favor of that party." *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995).

### 1. Selective Enforcement

■ Plaintiff claims that the Village has a policy of using its ordinances to limit the First Amendment rights of solicitors for minor political parties. (Cpt. ¶¶ 11, 13) In an attempt to satisfy the first *LeClair* requirement, plaintiff points to evidence which suggests that at least twelve solicitors for the Democratic and Republican parties obtained signatures on political petitions around the time of plaintiff's arrest. He alleges that none of these solicitors had a permit, yet none was arrested for soliciting without a permit. (Pl. 3(g) ¶ 13; Pl.Ex. 13; Pl.Ex. 16) However, plaintiff does not present direct evidence that the Village knew that persons were soliciting on behalf of major parties without permits, despite the fact that such knowledge is a prerequisite to the sort of selective enforcement claim brought here. *See Shumway v. United Parcel Service,* 118 F.3d 60, 64–65 (2d Cir.1997) (upholding summary judgement because "[i]t is impossible to demonstrate that UPS treated similarly situated males differently when there is not evidence that UPS knew about any other violations of the 'no fraternization' rule"). Thus, a question arises whether "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of [the nonmoving party's] case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

Although defendants need not introduce evidence which negates their opponent's claim, "a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323, 106 S.Ct. at 2553. Defendants have not made this showing. Defendants fail to allege, or present any

**12.** *Accord, FSK Drug Corp. v. Perales,* 960 F.2d 6, 10 (2d Cir.1992); *Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1352 (2d Cir.1994); *Zahra v. Town of Southold,* 48 F.3d 674, 683 (2d Cir.1995); *Crowley v. Courville,* 76 F.3d 47, 52–53 (2d Cir.1996).

evidence, that they were ignorant of the other solicitors' activities in the Village. They argue that Mr. Nimphius was arrested not because of his political solicitation, but because he was creating a disturbance. (Def.Rpy.Mem. 10–12) Defendants thus fail to rebut many of plaintiff's allegations, as they do not allege that they were ignorant of the solicitation efforts of the major parties, present no evidence regarding permit applications or the lack thereof by solicitors for major parties, and do not claim that any solicitor for a major party was arrested for solicitation without a permit. Absent such a showing, Mr. Nimphius need not come forward with any evidence of the Village's knowledge.

In any event, such evidence is present in the record. Although plaintiff has not come forward with direct evidence of knowledge, the Court concludes that an inference of knowledge perhaps may be drawn from the evidence that plaintiff has presented, which shows that at least twelve persons were soliciting for major parties during the same period in a town with a population of 5,443. It seems reasonable to infer that the Village Police and other authorities would have known that political solicitation by the major parties was occurring by virtue of the number of solicitors in, and the small size of, the Village. This conclusion is supported further by the fact that the Village's elected officials must have been familiar with the nature of political campaigns, and so probably would have known that political soliciting was taking place. Therefore, a material issue of fact exists regarding the Village's knowledge of the activities of solicitors for the major parties.

Defendants argue also that plaintiff was arrested because he was causing a disturbance, and not because of his political affiliation. They maintain that this alleged fact negates the discriminatory intent necessary to prove selective enforcement. Plaintiff maintains that he was peacefully soliciting petitions in the same manner as other political solicitors, and was arrested because of his political views. Whether Mr. Nimphius really was similar to other peaceable solicitors or was actually disorderly and arrested on that ground is a disputed issue of material fact and can not be resolved by the Court on this motion.[13] Taking the facts in the light most favorable to Mr. Nimphius, he has presented proof that others engaged in the same activity were not arrested by the Village, and such a showing is sufficient to satisfy the first *LeClair* requirement.

As regards the second *LeClair* requirement, plaintiff alleges that his arrest was part of an attempt to restrict the exercise of his First Amendment right to freedom of expression. The Village presents nothing to rebut this claim, and instead argues that plaintiff must allege that he is a member of a protected class to state an equal protection violation. Plaintiff's allegation thus satisfies the second *LeClair* requirement.

Defendants' motion for summary judgment on this claim is denied.

### 2. The Arrest.

■ Plaintiff's second equal protection claim is that the officers subjected him to a far more invasive and restricting procedure than normally would be used to deal with a violation of the solicitation and/or disorderly conduct ordinances when they actually arrested plaintiff. He alleges that the Village police usually would not arrest a person charged with the same crimes that he allegedly committed, nor would they have detained him or subjected him to various searches, but did so in his case "because of his political activities." (Pl. 3(g) ¶ 4) The defendants maintain that if plaintiff had not created a disturbance, he never would have been arrested, detained, or searched.

A factual dispute exists over exactly what sorts of people are similarly situated to the plaintiff. The defendants claim that they would treat any person causing a disturbance in the same manner as they treated Mr. Nimphius. Mr. Nimphius claims that he was

---

**13.** "[A] genuine issue of fact exists because, based on the evidence that other members of the public were permitted to voice their opinions without opposition, a rational jury could infer that [defendants] singled out [plaintiff] out of dislike for what [plaintiff] had to say." *Musso v. Hourigan,* 836 F.2d 736, 743 (2d Cir.1988).

not causing a disturbance, and so was treated differently than other peaceable violators of Village laws. The resolution of the dispute regarding Mr. Nimphius' behavior is obviously essential to the determination of this cause of action. Thus, this matter is not proper for summary judgment, and defendants' motion is denied as to this claim.[14]

### III. Probable Cause for Arrest

■ Mr. Nimphius claims that the defendants violated his Fourth Amendment rights under color of state law by arresting him for disorderly conduct absent probable cause. The defendants move for summary judgment on this claim, arguing that Mr. Nimphius' behavior provided the arresting officers with sufficient cause for his arrest.

The Village disorderly conduct statute provides that:

"It shall be unlawful for any person to engage in noisy, riotous or tumultuous conduct or language, disturbing or tending to disturb the peace and quiet of the Village or any meeting or assembly therein, or to incite, or aid in any riotous, tumultuous assemblage, in or on any private property or streets or the doorways or staircases adjacent thereto." (Def.Mem. 15)

Defendants argue that:

"[t]he testimony of the officer defendants established that the plaintiff refused to comply with the officers" order that the plaintiff leave the area and obtain the necessary permit. The testimony further demonstrates that plaintiff instead chose to stay at the scene to argue with the defendants displaying conduct which posed a substantial risk of a breach of the peace, and plaintiff even consented to the arrest when he raised his two hands and told Officer Panaro to arrest him.

"There is ample evidence in the record to establish that shouting and pointing his finger in a threatening manner in the officers' faces [sic] ... and consequently there was probable cause for his arrest." (Def.Mem. 15–16)

Defendants' sole argument, in essence, is that on their version of the facts there was ample cause to arrest the plaintiff for disorderly conduct. Mr. Nimphius, however, has denied that he caused any sort of disturbance. He maintains that "although [he] berated the defendant police officers as uneducated ignoramuses, he did [sic] neither shouted nor caused a disturbance" (Pl.Mem. 4–5) and denies that anyone raised their voice or that a crowd gathered. (Nimphius Dep.Ex. 6, 32–33) This Court may not resolve disputes of fact on this motion and must draw all reasonable inferences in favor of the non-moving party. Vann, 72 F.3d at 1048–49. Thus, the Court assumes that Mr. Nimphius never shouted or raised his voice before he was arrested, although he did refer to the defendant officers as ignoramuses.

■ In this federal civil rights action, the Court looks to the probable cause standard found in the Fourth Amendment of the United States Constitution. Probable cause is not an especially demanding standard and is established "when the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'" O'Neill v. Town of Babylon, 986 F.2d 646, 650 (2d Cir.1993) (quoting Calamia v. City of New York, 879 F.2d 1025, 1032 (2d Cir.1989)). Nevertheless, it borders on the absurd to claim that Mr. Nimphius' version of his behavior would constitute probable cause to believe that he was violating the disorderly conduct ordinance. Calling a group of police officers ignoramuses is not polite, or even advisable, but it is nothing like the conduct prohibited by the Village ordinance. The motion for summary judgment on this claim is frivolous and is denied.

### IV. Liability of the Village

Defendants argue that plaintiff may not recover from the Village in this action because he has not alleged facts sufficient to establish municipal liability under 42 U.S.C. § 1983. Plaintiff argues to the contrary,

---

**14.** The Court notes that plaintiff sufficiently has alleged that he was subjected to the unusually rigorous procedures in furtherance of a policy seeking to keep him from exercising his First Amendment rights. This allegation satisfies the second LeClair requirement.

claiming that his allegation of a municipal policy entitles him to recover from the Village.

Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a municipality "may not be held liable under § 1983 simply for isolated unconstitutional acts of its employees." *Sorlucco v. New York City Police Department*, 971 F.2d 864, 871 (2d Cir.1992) (citing *Monell*). In order to establish such liability, a plaintiff must show that the violation of his or her constitutional rights resulted from a municipal custom or policy.[15] Such a municipal policy, of course, may be established by showing that it is explicitly stated in a legislative or administrative enactment of the municipality's policy-making authority. A plaintiff may establish municipal liability also by showing that the violation was "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.

A municipal custom may be proved through circumstantial proof, such as evidence that the municipality failed to train its employees to such a degree as to display a deliberate indifference to the constitutional rights of those within its jurisdiction or evidence that it had notice of, but failed to investigate, charges that its agents had persistently violated the civil rights of citizens. *Sorlucco*, 971 F.2d at 870. A simple assertion of a municipal policy or custom is insufficient without allegations of fact which at least circumstantially support an inference that such a policy exists. *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir.1983). Moreover, it is clear that "a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 122 (2d Cir.1991) (citing *City of*

*Canton v. Harris*, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989)).[16] The discriminatory practices alleged must be "permanent and well settled" in order to subject a municipality to liability. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168, 90 S.Ct. 1598, 1614, 26 L.Ed.2d 142 (1970).

### A. Arrest Under an Unconstitutional Statute

It is almost self-evident that plaintiff's claim against the Village for his arrest under an unconstitutional statute supports municipal liability under *Monell*. The statute in question is undoubtedly a municipal policy that was promulgated by the highest decision making authority of the Village. "Local governing bodies can be sued directly under § 1983 for monetary, declaratory or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690, 98 S.Ct. at 2035–36. Thus, the Village will be liable for any damages plaintiff proves were caused by his arrest under the solicitation statute.

### B. Equal Protection and Fourth Amendment Claims

Plaintiff's equal protection and Fourth Amendment claims rely on the same legal theory and factual allegations to establish municipal liability. Both allege that the Village had a policy of discriminating against minor parties and that plaintiff's arrest and the enforcement of the solicitation ordinance against him were manifestations of this policy. Plaintiff, however, fails to point to any statement, formal or informal, by any policy-making body or official of the Village reflecting establishment of the alleged policy. Thus, plaintiff is alleging an informal custom of discrimination and is attempting to prove its existence by pointing to the actions of

---

**15.** *See, e.g., Pembaur v. City of Cincinnati*, 475 U.S. 469, 478–79, 106 S.Ct. 1292, 1297–98, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 818, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38; *Sorlucco*, 971 F.2d at 870.

**16.** *See also City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436–37, 85 L.Ed.2d 791 (1985); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir.1986); *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir.), *cert. denied*, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980).

Village employees below the policy-making level. Moreover, he points to no other incident in which a minor party solicitor was arrested, or even approached, by Village police and presents no other evidence of a custom.[17] His argument is that a single action by municipal employees below the policy-making level demonstrates a custom. A single, isolated incident alleged in a complaint, however, does not suffice to show a municipal custom. *City of Canton,* 489 U.S. at 387, 109 S.Ct. at 1204; *Ricciuti,* 941 F.2d at 122. Plaintiff fails to allege facts which would establish a common and well settled custom that fairly represents municipal policy.

Defendant's motion for summary judgement is granted insofar as it seeks dismissal of these claims against the Village and the individual defendants in their official capacities.

### V. Liability of the Individual Defendants

■■■■ Defendants seek dismissal of all of plaintiff's claims against the individual defendants on the ground that they are entitled to qualified immunity.

"As government officials performing discretionary functions, the defendants enjoy a qualified immunity that shields them from personal liability for damages under Section 1983 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known,' *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *Zavaro v. Coughlin,* 970 F.2d 1148, 1153 (2d Cir. 1992), or insofar as it was objectively reasonable for them to believe that their acts did not violate those rights, *see Anderson v. Creighton,* 483 U.S. 635, 638–39, 107

S.Ct. 3034, 3038–39 (1987); *Oliveira v. Mayer,* 23 F.3d 642, 648 (2d Cir.1994) [, *cert. denied,* 513 U.S. 1076, 115 S.Ct. 721, 130 L.Ed.2d 627 (1995) ]." *Velardi v. Walsh,* 40 F.3d 569, 573 (2d Cir.1994) (parallel citations omitted).

In determining whether a right was clearly established at the time a defendant acted, a court must consider (1) whether the right in question was defined with "reasonable specificity," (2) whether decisional law of the Supreme Court and this Circuit court support the existence of the right in question, and (3) whether under preexisting law a reasonable defendant official would have understood that his or her actions were unlawful. *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991), *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). If the federal right that plaintiff claims was violated is found to have been clearly established at the time the defendant acted, a defendant is entitled to qualified immunity only if he or she can prove the objective reasonableness of his or her actions.

### A. Arrest Under Unconstitutional Statute

■■■ Plaintiff claims that his First Amendment right to express his views on political matters was violated by his arrest under the unconstitutional soliciting statute. While freedom of expression is clearly a well established right, the inquiry can not stop at such a generalized level. *See Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523 (1987). However, even if the right asserted by plaintiff is defined narrowly as the right to solicit from house to house for a particular cause, its protection was recognized by numerous decisions of the Supreme Court well before the events at issue here.[18] In fact, as explained

17. Plaintiff might argue, though he does not, that the continued failure to arrest major party solicitors was a continuing practice involving many separate examples of the Village policy. However, the treatment of the major party solicitors is not relevant to this inquiry. The allegation here is that the city had a policy of using its laws to stifle minority party expression. The implementation of that policy would come through action taken against other minority party solicitors. What the city did or did not do to majority party

solicitors does not prove that it had a policy toward minority solicitors.

18. *See Riley,* 487 U.S. at 802, 108 S.Ct. at 2680–81 (right to solicit from house-to-house); *Schaumburg,* 444 U.S. at 620, 100 S.Ct. at 827–28 (same); *Schneider,* 308 U.S. at 164, 60 S.Ct. at 152 (right to solicit from house-to-house); *Lovell,* 303 U.S. at 450–51, 58 S.Ct. at 668–69 (right to solicit established since 1938); *see also International Society for Krishna Consciousness,* 505

above, a number of decisions have invalidated statutes functionally identical to the Village ordinance's permit requirement. The *Schneider* case, decided in 1939, should have made it clear that allowing an official unfettered discretion to withhold solicitation permits to violates the First Amendment.[19] Moreover, the ordinance's other infirmities violate clearly established rules regarding the regulation of expression. The Court concludes, therefore, that the rights violated here were clearly established for qualified immunity purposes. *Jermosen*, 945 F.2d at 550.

▇ The fact that defendants violated well-established rights does not end the qualified immunity inquiry, however. Defendants nevertheless may be entitled to qualified immunity because:

> "Even where the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, the defendant may enjoy qualified immunity if it was objectively reasonable for him to believe that his acts did not violate those rights.... In such a case, the defense will turn on the particular facts, and summary judgment will be appropriate only if the defendant 'adduce[s] sufficient facts [such] that no reasonable jury, looking at the evidence in the light most favorable to, the plaintiffs, conclude that it was objectively unreasonable for the defendant[ ]' to believe that he was acting in a fashion that did not violate an established federally protected right." *Frank v. Relin*, 1 F.3d 1317, 1328 (2d Cir.1993) (quoting *Halperin v. Kissinger*, 807 F.2d 180, 189 (D.C.Cir. 1986) (Scalia, J., sitting by designation) (internal citations omitted)).

The reasonableness of defendants' actions in arresting plaintiff under the Village soliciting ordinance presents a difficult question. There is great appeal to the argument that a police officer who enforces a duly enacted statute should be protected by qualified immunity as a matter of law. The essence of a police officer's duty is to carry out the laws of his or her jurisdiction, and officers' duties generally are not held to include legal scholarship. Because an officer ordinarily has the right to rely on the existence of a particular statute, it seems fair to hold that when a police officer enforces a statute, the officer is entitled to believe that he or she is not violating the constitutional rights of the arrestee unless a court previously has ruled on the very statute at issue. Any other rule would require a police officer to make an independent judgment as to the constitutionality of every statute he or she is empowered to enforce. Moreover, in cases such as this, *Monell* liability will be available against the Village for any compensatory damages the plaintiff seeks, and thus the rule would not preclude recovery.

▇ However, for the purposes of determining qualified immunity, the Supreme Court has indicated clearly that a police officer generally is charged with knowledge of the law governing his or her office. In this case, the law made it clear that the Village ordinance violated the First Amendment. Enforcement of the ordinance in the light of substantial precedent establishing its invalidity at least arguably was unreasonable. Because they are unable to establish the absence of an issue of fact as to the objective legal reasonableness of their actions, defendants are not entitled to qualified immunity on this claim.

## B. *Equal Protection Claims*

▇ Plaintiff claims that he was denied equal protection because the Village ordinances were applied selectively to him in order to limit the exercise of his right to expression. A person's right to be free from selective prosecution is supported by substantial precedent in the Supreme Court and Second Circuit. *See, e.g. LeClair*, 627 F.2d at 610; *see also* note 12, *supra*, (citing cases). Thus, defendants are entitled to qualified immunity only if their actions were objectively reasonable.

There is a factual dispute in this case whether Mr. Nimphius simply was a peaceful solicitor or was acting in a disorderly manner. If plaintiff proves at trial that he was

---

U.S. at 677, 112 S.Ct. at 2704–05; *Hynes*, 425 U.S. at 616–20, 96 S.Ct. at 1758–60.

**19.** *Schneider*, 308 U.S. at 164, 60 S.Ct. at 152.

not disorderly, a jury would be justified in holding that defendants' actions were unreasonable in arresting him while other solicitors were permitted to canvass the Village. Defendants' motion for summary judgment on this claim on the ground of qualified immunity is denied.

### C. Fourth Amendment Claims

■ Plaintiff claims that the defendants lacked probable cause to arrest him for disorderly conduct. "It is settled that a person has a clearly established right not to be arrested or prosecuted without probable cause." *Soares v. Connecticut,* 8 F.3d 917, 920 (2d Cir.1993) (citing *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir.1991), *cert. denied,* 505 U.S. 1221, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992)); *see Martinez v. City of Schenectady,* 115 F.3d 111, 115 (2d Cir.1997). Defendants' qualified immunity defense therefore depends on whether it was objectively reasonable for them to have believed that their actions did not violate the plaintiffs' constitutional rights.

As the Court has explained above, there is a factual dispute regarding Mr. Nimphius' behavior on the date of his arrest. If Mr. Nimphius can establish at trial that he was behaving in a peaceable manner, a jury would be justified in finding that the defendants lacked qualified immunity because their actions in arresting plaintiff for disorderly conduct were objectively unreasonable. *See Frank,* 1 F.3d at 1328. Defendants' motion therefore is denied as to this claim.

### Conclusion

For the reasons expressed above, defendants' motion for summary judgment is granted insofar as it seeks dismissal of plaintiff's claims that the Village and the individual defendants in their official capacities violated his rights under the Equal Protection Clause and arrested plaintiff without probable cause in violation of the Fourth and Fourteenth Amendments. It is denied in all other respects.

SO ORDERED.